Barry I. Levy
Michael A. Sirignano
Sean Gorton
Thomas Paddock
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and               Docket No.:_____ (      )
GEICO CASUALTY COMPANY,

                                    Plaintiffs,                    **Plaintiff Demands a Trial by Jury**

      -against-

J FLEXIBLE CORP., LJR NY INC., YEVGENIYA
IVANOVA, and JOHN DOE DEFENDANTS 1-10,

                                 Defendants.
-----------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against J Flexible Corp., LJR NY Inc., Yevgeniya Ivanova, and John Doe Defendants 1-10 (collectively, the "Defendants"), hereby allege as follows:

## INTRODUCTION

1.      GEICO brings this action to terminate a fraudulent scheme perpetrated by the Defendants who exploited the New York "No-Fault" insurance system by billing GEICO more

1

than $2.7 million over the course of eight months for purportedly dispensing durable medical equipment ("DME") to individuals who claimed to have been involved in automobile accidents and were eligible for coverage under no-fault insurance policies issued by GEICO ("Insureds") in a systematic, predetermined fashion, without regard for genuine patient care. As part of the fraudulent scheme and to maximize their profits as quickly as possible, the Defendants engaged in collusive arrangements to steer large volumes of medically unnecessary prescriptions to two companies -- Defendants J Flexible Corp. ("J Flexible") and LJR NY Inc. ("LJR") -- which were used by Defendants to conceal the volume of fraudulent billing submitted pursuant to the scheme.

2.      J Flexible and LJR (collectively, the "Provider Defendants"), and their record owner, Yevgeniya Ivanova ("Ivanova"), submitted, or caused to be submitted, hundreds of fraudulent no-fault insurance charges to GEICO relating to medically unnecessary, illusory, and otherwise non-reimbursable DME primarily in the form of (i) so-called "Pulsed Electro-Magnetic Field Therapy" devices (the "PEMF Devices"), which they falsely billed as "Electrical Osteogenesis Stimulators" a/k/a bone growth stimulation devices ("Osteogenesis Stimulators"); and (ii) Powered Pressure-Reducing Air Mattresses ("Powered Air Mattresses") (together with the PEMF Devices/Osteogenesis Stimulators, the "Fraudulent Equipment").  Ivanova effectuated the scheme to submit large volumes of billing to GEICO and other New York automobile insurance companies for the Fraudulent Equipment by colluding with the operators and managers (the "Clinic Controllers") of various No-Fault medical clinics (the "Clinics") and various physicians and other healthcare providers (the "Referring Providers") that allegedly prescribed DME to individuals who claimed to have been involved in automobile accidents, including Insureds, and treated at the Clinics.

3.      Based upon purported prescriptions for Fraudulent Equipment allegedly issued by the Referring Providers and steered to Ivanova and the Provider Defendants (collectively, the "DME Defendants"), the DME Defendants purported to provide the targeted Fraudulent Equipment to individuals who were involved in automobile accidents and were eligible for insurance coverage under GEICO insurance policies (the "Insureds"). To the extent that any Fraudulent Equipment was actually provided to Insureds, the bills for the Fraudulent Equipment submitted to GEICO by the DME Defendants misrepresented the type and nature of the Fraudulent Equipment in order to inflate the charges and maximize the Defendants' ill-gotten gains.

4.      By this action, GEICO seeks to recover more than $455,000.00 that has been wrongfully obtained by the DME Defendants, and further seeks a declaration that it is not legally obligated to pay reimbursement of more than $2 million in pending no-fault insurance claims that have been submitted through the Provider Defendants because:

(i)     The DME Defendants billed GEICO for Fraudulent Equipment pursuant to a fraudulent scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the DME Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care, and which included dispensing Fraudulent Equipment that was not medically necessary and which was prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements;

(ii)    The bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment; and

(iii)   The DME Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent actually provided – as a result of decisions that were made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions.

5.      The Defendants fall into the following categories:

(i)     Defendants J Flexible and LJR (i.e., the Provider Defendants) are New York corporations that purport to provide Fraudulent Equipment to persons who

3

were allegedly injured in motor vehicle accidents, and then bill New York automobile insurance companies, including GEICO;

(ii)     Defendant Ivanova owns, operates, and controls the Provider Defendants and uses them to submit bills to GEICO and other New York automobile accident victims;

(iii)    John Doe Defendants "1" – "10" ("John Doe Defendants") include persons and entities not presently identifiable but who are (i) participants in the operation and control of the Provider Defendants and (ii) Clinic Controllers associated with the Clinics, who are not licensed healthcare professionals but who illegally own and control the Clinics and the relationships with the Referring Providers, and who have conspired with Ivanova and the Provider Defendants to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

6.      As discussed below, the Defendants have always known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because: (i) the billing submitted to GEICO was pursuant to a fraudulent scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the DME Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care, and which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements that involved the payment of kickbacks and other financial incentives; (ii) the Fraudulent Equipment was provided – to the extent actually provided – as a result of decisions that were made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions; and (iii) the charges were intentionally inflated based upon an exploitation of the payment formulas set forth in New York's "No-Fault" laws.

7.      As such, the DME Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through the Provider Defendants.

4

8.    The charts attached hereto as Exhibits "1" through "3" set forth a representative sample of the fraudulent claims that have been identified to date that the DME Defendants submitted, or caused to be submitted, to GEICO through the Provider Defendants.

9.    Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began in September 2024 has continued uninterrupted through the present day, as the DME Defendants continue to seek collection on pending charges for the Fraudulent Services.  As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $455,000.00.

**THE PARTIES**

## I.    Plaintiffs

10.    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

## II.    Defendants

11.    Defendant J Flexible is a New York corporation that was incorporated on or about August 16, 2024 and has its principal place of business in Kings County, New York.  At all relevant times, J Flexible has been owned and operated by Ivanova, and has been used by Ivanova as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

12.    Defendant LJR is a New York corporation that was incorporated on or about July 19, 2024 and has its principal place of business at the same address as J Flexible in Kings County, New York.  At all relevant times, LJR has been owned and operated by Ivanova, and has been

5

used by Ivanova as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

13.     Defendant Ivanova resides in and is a citizen of New York, and, at all relevant times, has owned and operated J Flexible and LJR.

14.     Ivanova is not and has never been a licensed healthcare provider, and entered into unlawful arrangements with the Clinic Controllers and others who are not presently identifiable in exchange for referrals to the Provider Defendants for the Fraudulent Equipment.

15.     Upon information and belief, John Doe Defendants "1"-"10" reside in and are citizens of New York and are not presently identifiable, but include (i) participants in the operation and control of the Provider Defendants and (ii) Clinic Controllers associated with the Clinics, who are not licensed healthcare professionals but who illegally own and control the Clinics and the relationships with the Referring Providers, and who have conspired with Ivanova and the Provider Defendants to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

17.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

18.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred and is the District where one or more of the Defendants reside.

**ALLEGATIONS COMMON TO ALL CLAIMS**

19.     GEICO underwrites automobile insurance in the State of New York.

**I.     An Overview of the Pertinent Laws**

**A.     Pertinent Laws Governing No-Fault Insurance Reimbursement**

20.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

21.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

22.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME. See N.Y. Ins. Law § 5102(a).

23.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

24.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

7

25.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

26.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

27.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

28.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.      Pertinent Statutes and Regulations Relating to No-Fault Benefits, DME, and OD**

29.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME that was provided without a

8

prescription, pursuant to an unlawful prescription, or by reason of a decision of a layperson or an individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

30. Under New York State's Public Health Law, "a practitioner may not make a referral to a health care provider for the furnishing of any health or health related items or services where such practitioner…has any of the following financial relationships without disclosing to the patient such financial relationship:…(b) a compensation arrangement." See N.Y. P.H.L. § 238-d(1). A practitioner is defined to include "a licensed or registered physician, dentist, podiatrist, chiropractor, nurse, midwife, physician assistant or specialist assistant, physical therapist, or optometrist". See N.Y. P.H.L. § 238(11).

31. A health care provider is defined to include "a purveyor of health or health related supplies, appliances, or equipment", which includes DME retailers such as the Provider Defendants. See N.Y. P.H.L. § 238(6). A compensation arrangement, as referenced in N.Y. P.H.L. § 238-d, includes any remuneration, whether directly, indirectly, overtly, covertly, in cash, or in kind that is between a practitioner and a health care provider. See N.Y. P.H.L. § 238-a(5)(a).

32. DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), osteogenesis stimulators, infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electric moist heating pads (known as thermophores), cervical traction units, whirlpool baths, cryotherapy units, continuous passive motion devices, and devices to prevent deep vein thrombosis.

33. To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME charges, the maximum charges that may be submitted by

healthcare providers for DME are set forth in the New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("DME Fee Schedule"), which is reflected in 12 N.Y.C.R.R. § 442.2.

34.     In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment" the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

35.     According to the DME Fee Schedule, certain pieces of DME have an established fee payable ("Fee Schedule item"), which is the maximum permissible charge for a specific item of DME based on its Healthcare Common Procedure Coding System ("HCPCS") Code, which provides specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under that specific HCPCS Code.

36.     For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under a specific HCPCS Code.

37.     The DME Fee Schedule uses HCPCS Codes promulgated by Palmetto to identify the maximum charge for selling specific DME.

38.    Where a specific piece of DME does not have a maximum reimbursement rate in the DME Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.  See 11 N.Y.C.R.R. 68, Appendix 17-C, Part E.

39.    For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement."  See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

40.    Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)    The provider is in compliance with all significant statutory and regulatory requirements;

(ii)    The provider received a legitimate prescription that was issued in accordance with the requirements of applicable laws and is for reasonable and medically necessary DME from a healthcare practitioner that is licensed to issue such prescriptions;

(iii)    The DME identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(iv)    The HCPCS Code identified in the bill actually represents the DME that was provided to the patient; and

(v)    The fee sought for DME provided to an Insured was not in excess of the price contained in the DME Fee Schedule or the standard used for a Non-Fee Schedule item.

## II.    The Defendants' Fraudulent Scheme

### A.    Overview of the Defendants' Fraudulent Scheme

41.    Beginning in 2024, the Defendants devised and implemented a complex fraudulent scheme in which the Provider Defendants were used as vehicles to bill GEICO and other New York automobile insurers millions of dollars in No-Fault Benefits to which they were never entitled to receive.

42.    The Provider Defendants lacked any genuine retail or office location and both used the same residential address in Brooklyn, New York associated with Ivanova.

43.    To date, the DME Defendants have wrongfully obtained more than $455,000.00 from GEICO, and there is more than $2 million in additional fraudulent claims that have yet to be adjudicated, but for which the DME Defendants continue to seek payment from GEICO.

44.    The Defendants exploited GEICO Insureds, as well as insureds of other New York automobile insurers, by purporting to dispense targeted items of medical equipment – the PEMF Devices and Powered Air Mattresses – to patients at various multi-disciplinary medical clinics that primarily treat patients with No-Fault insurance (i.e., the Clinics). The specific Fraudulent Equipment purportedly dispensed by Defendants is considered experimental and/or has limited accepted use but was prescribed and dispensed solely to maximize profits without regard to medical necessity or genuine patient care.

45.    Indeed, as discussed in more detail below, the DME Defendants allegedly dispensed the PEMF Devices to purportedly provide pulsed electromagnetic stimulation for the treatment of Insureds with injuries resulting from automobile accidents, though there is no

legitimate body of evidence that establishes the effectiveness of pulsed electromagnetic field therapy for this type of treatment.  The Powered Air Mattresses that the DME Defendants allegedly dispensed to Insureds are used to treat patients who are bedridden for extended periods of time and who develop, or are at a high risk of developing, pressure ulcers, though the Insureds who were dispensed, or purportedly dispensed, such a mattress were not bedridden for extended periods and not at risk for developing pressure ulcers.

46.      As part of the Defendants' fraudulent scheme to dispense and bill for medically unnecessary DME, the DME Defendants colluded with the Clinic Controllers in order to obtain prescriptions for Fraudulent Equipment, which in turn permitted the Provider Defendants to bill GEICO more than $2.7 million over the course of approximately eight months by dispensing medically unnecessary Fraudulent Equipment.

47.      The prescriptions obtained by the DME Defendants were virtually never given to the Insureds, but as part of the scheme, they were routed directly to the DME Defendants from the Clinic Controllers pursuant to collusive arrangements, which included the payment of kickbacks and other financial incentives, to ensure that the Insureds did not fill the prescriptions with legitimate DME providers.

48.      The DME Defendants then utilized the prescriptions to purportedly provide Fraudulent Equipment to Insureds, and then misrepresented the nature of the items purportedly dispensed in order to impermissibly inflate their charges to insurance companies such as GEICO.

49.      In order to conceal the nature of the fraudulent scheme and maximize the amount of No-Fault Benefits the DME Defendants could receive, Ivanova used the Provider Defendants in sequential fashion to divide the billing that they were submitting to No-Fault insurance carriers, including GEICO.

13

50.     Specifically, J Flexible submitted more than $425,000.00 in fraudulent claims to GEICO for Fraudulent Equipment purportedly dispensed between September 2024 and November 2024, at which point J Flexible ceased billing GEICO.  LJR subsequently began billing GEICO for Fraudulent Equipment beginning in December 2024 and has submitted more than $2.3 million in fraudulent claims to GEICO for Fraudulent Equipment purportedly dispensed between December 2024 and May 2025.

**B.      The Collusive Referral Arrangements to Obtain Illegitimate and Medically Unnecessary Prescriptions**

51.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics from where the DME Defendants generated the prescription and referrals for the Fraudulent Equipment – and which are associated with the Referring Providers and Clinic Controllers – are really organized to supply a host of medically unnecessary healthcare goods and services so as to exploit patients for financial gain.

52.     Ivanova did not market or advertise the Provider Defendants to the general public, the Provider Defendants lacked any genuine retail or office location, and operated without any legitimate efforts to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

53.     Similarly, Ivanova did virtually nothing that would be expected of the owner of a legitimate DME supply company to develop its reputation in the medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

54.     Instead, the DME Defendants entered into collusive agreements with the Clinic Controllers, who steered the Referring Providers to prescribe and direct large volumes of prescriptions to the Provider Defendants for the specifically targeted Fraudulent Equipment.

14

55.     Since the inception of the fraudulent scheme, the DME Defendants engaged in various collusive arrangements with the John Doe Defendants pursuant to which the DME Defendants paid kickbacks or other financial incentives in exchange for being provided prescriptions to fill from the Referring Providers that could be used to support the charges submitted to GEICO and other insurers for the Fraudulent Equipment dispensed through the Provider Defendants.

56.     However, the collusive nature of the agreement goes beyond the simple payment of money or other financial incentives, as it also includes: (i) the ability to secure the prescriptions without ever meeting the Referring Providers; and (ii) obtaining the prescriptions directly from the staff at the Clinics, without any communication or involvement by the Insureds.

57.     The collusive arrangements allowed the scheme to remain undetected by the Insureds and allowed the DME Defendants to access large volumes of prescriptions that in turn afforded them the opportunity to submit charges for Fraudulent Equipment for each Insured to GEICO and other automobile insurers.  But for the collusive arrangements, neither the John Doe Defendants nor the Referring Providers would have had any reason to direct a substantial volume of these medically unnecessary prescriptions for Fraudulent Equipment to the Provider Defendants to purportedly fill.

58.     Upon information and belief, the Referring Providers were compensated by the John Doe Defendants, whether financially or through some other economic quid pro quo (e.g. the ability to treat the Insured and separately bill GEICO), for the Referring Providers' willingness to permit prescriptions to be issued in their names and to be given to DME retailers, including the Provider Defendants, rather than given to the Insureds or to a bona-fide DME/OD retailer, who would likely question its legitimacy.

59.     The collusive arrangements in relation to the prescriptions routed to the Provider Defendants are the very kind of arrangements that are prohibited by N.Y. Public Health Law § 238-d, without a specific disclosure to the patient of the financial relationship between the Referring Provider and the Provider Defendants. In actuality, no such disclosure required by Public Health Law § 238-d was ever disclosed to the Insureds identified in Exhibits "1"-"3".  Rather, because of the nefarious nature of the relationship between the DME Defendants and the John Doe Defendants, the arrangements between and among the DME Defendants, John Doe Defendants, and Referring Providers was concealed from the Insureds.

60.     As a result of these collusive relationships, the DME Defendants (rather than the Insured or a bona-fide DME/OD retailer) were given illegitimate prescriptions for medically unnecessary Fraudulent Equipment that was not based upon each Insured's individual need.

61.     In further keeping with the fact that the prescriptions for Fraudulent Equipment used by the DME Defendants to support the charges identified in Exhibits "1"-"3" were medically unnecessary and the result of improper collusive relationships, in many instances, the prescriptions filled by the DME Defendants were purportedly issued on dates that the Insureds did not treat with the Referring Providers.

62.     For example:

    i.    Insured KB was allegedly involved in a motor vehicle accident on September 13, 2024. On October 14, 2024, J Flexible purportedly provided KB a PEMF Device billed to GEICO under HCPCS Code E0747 pursuant to a prescription purportedly issued by Nick Nicoloff PA ("PA Nicoloff") on September 26, 2024. However, KB did not treat with PA Nicoloff on September 26, 2024.

    ii.    Insured MP was allegedly involved in a motor vehicle accident on September 13, 2024. On October 16, 2024, J Flexible purportedly provided MP a PEMF Device billed to GEICO under HCPCS Code E0747 pursuant to a prescription purportedly issued by PA Nicoloff on September 26, 2024. However, MP did not treat with PA Nicoloff on September 26, 2024.

iii.   Insured MD was allegedly involved in a motor vehicle accident on September 13, 2024. On October 16, 2024, J Flexible purportedly provided MD a PEMF Device billed to GEICO under HCPCS Code E0747 pursuant to a prescription purportedly issued by PA Nicoloff on September 26, 2024. However, MD did not treat with PA Nicoloff on September 26, 2024.

iv.   Insured MB was allegedly involved in a motor vehicle accident on November 2, 2024. On December 12, 2024, LJR purportedly provided MB a PEMF Device billed to GEICO under HCPCS Code E0747 pursuant to a prescription purportedly issued by PA Nicoloff on November 7, 2024. However, MB did not treat with PA Nicoloff on November 7, 2024.

v.   Insured NW was allegedly involved in a motor vehicle accident on November 2, 2024. On December 12, 2024, LJR purportedly provided NW a PEMF Device billed to GEICO under HCPCS Code E0747 pursuant to a prescription purportedly issued by PA Nicoloff on November 7, 2024. However, NW did not treat with PA Nicoloff on November 7, 2024.

63.   These are only representative examples.

64.   The DME Defendants were able to enter collusive financial arrangement schemes with the Clinic Controllers in order to steer prescriptions purportedly issued by the Referring Providers to the Provider Defendants because the Referring Providers operated at Clinics that are nothing more than multidisciplinary medical mills organized to be convenient "one-stop shops" for No-Fault insurance fraud.

65.   These Clinics included, but were not limited to:

- 102-28 Jamaica Avenue, Queens;
- 5506 Avenue N, Brooklyn;
- 6 Gramatan Avenue, Mount Vernon;
- 719 Southern Boulevard, Bronx; and
- 1 Cross Island Plaza, Queens
- 1339 E Gun Hill Road, Bronx;
- 2558 Holland Avenue, Bronx;

17

66.     The Clinics provide facilities for the Referring Providers, as well as a "revolving door" of medical professional corporations, all geared towards exploiting New York's No-Fault insurance system.

67.     In fact, GEICO has received billing from an ever-changing number of healthcare providers at a variety of different Clinics that start and stop operations without any purchase or sale of a "practice," without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's No-Fault insurance system.

68.     For example, GEICO has received billing from the Clinic located at 5506 Avenue N, Brooklyn from a "revolving door" of more than 100 different healthcare providers; GEICO has received billing from the Clinic located at 1339 E Gun Hill Road, Bronx from a "revolving door" of more than 50 different healthcare providers; GEICO has received billing from the Clinic located at 2558 Holland Avenue, Bronx from a "revolving door" of more than 70 different healthcare providers; GEICO has received billing from the Clinic located at 102-28 Jamaica Avenue, Queens from a "revolving door" of more than 60 different healthcare providers; and GEICO has received billing from the Clinic located at 6 Gramatan Avenue, Mount Vernon from a "revolving door" of more than 60 different healthcare providers.

69.     Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics, and directed fraudulent protocols used to maximize profits without regard to genuine patient care.

70.     For example, PA Nicoloff stated under oath, among other things, that the Clinic located at 5506 Avenue N, Brooklyn forged his signature on multiple prescriptions for DME that

were issued after PA Nicoloff terminated his association with the Clinic in March 2023. The DME Defendants filled multiple forged prescriptions issued in PA Nicoloff's name.

71. As a further example, Inna Levtsenko, N.P. stated under oath that she resigned from the Clinic located at 2558 Holland Avenue, Bronx after discovering, among other things, that the office manager at the Clinic was altering her examination reports and issuing prescriptions in her name that she did not authorize.

72. In further keeping with the fact that the prescriptions for Fraudulent Equipment used by the DME Defendants to support the charges identified in Exhibits "1"-"3" were the result of improper collusive arrangements, the DME Defendants, as set forth above, obtained prescriptions for Fraudulent Equipment directly from the Clinic Controllers, without any communication or involvement by the Insureds.

73. In further keeping with the fact that the prescriptions for Fraudulent Equipment used by the DME Defendants to support the charges identified in Exhibits "1"-"3" were the result of improper collusive relationships, and as explained in detail below, the prescriptions were not medically necessary and were provided pursuant to predetermined fraudulent protocols.

74. Unlike legitimate medical supply companies that dispense a variety of DME devices and healthcare related products, the Provider Defendants intentionally targeted the Fraudulent Equipment so they could submit inflated claims for reimbursement to GEICO.

75. This scheme enabled the Defendants to maximize the amount of No-Fault Benefits they could obtain from GEICO and other New York automobile insurers through the submission of claims for Fraudulent Equipment.

76. Specifically, from September 2024 through November 2024, the targeted Fraudulent Equipment – the PEMF Devices – accounted for 100% of the billing the DME Defendants submitted or caused to be submitted through J Flexible.

77. Similarly, from December 2024 through May 2025, the targeted Fraudulent Equipment – the PEMF Devices and Powered Air Mattresses – accounted for 100% of the billing the DME Defendants submitted or caused to be submitted through LJR.

78. But for the collusive arrangements, which included the payment of kickbacks and/or other compensation by the DME Defendants, the Clinic Controllers, working with the Referring Providers, would not have had any reason to issue large volumes of prescriptions for the targeted Fraudulent Equipment and to route those prescriptions to the Provider Defendants.

**C.    The Medically Unnecessary Prescriptions Obtained Pursuant to Predetermined Fraudulent Protocols**

79. In accordance with the fraudulent scheme discussed above, the DME Defendants routinely billed GEICO for dispensing Fraudulent Equipment that is considered experimental and/or has limited accepted use pursuant to prescriptions that were issued without regard to medical necessity and were provided to the DME Defendants pursuant to predetermined fraudulent protocols between and among the DME Defendants, the Clinic Controllers, and the Referring Providers.

80. The predetermined fraudulent protocols were implemented solely to maximize the billing that the DME Defendants could submit to insurers, including GEICO, rather than to treat the Insureds.

81. No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued upon the fraudulent protocols described below.

82.     In the claims identified in Exhibits "1" through "3", virtually all the Insureds were involved in relatively minor and low impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

83.     In keeping with the fact that many of the Insureds identified in Exhibits "1" through "3" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

84.     To the extent that the Insureds in the claims identified in Exhibits "1" through "3" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis and discharged with nothing more serious than a minor soft tissue injury such as a sprain or strain.

85.     Despite virtually all the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds who were treated by the Referring Providers were subjected to extremely similar treatment, including substantially identical prescriptions for Fraudulent Equipment that was dispensed by the Provider Defendants.

86.     In keeping with the fact that the prescriptions were provided as part of predetermined protocols to maximize profits – not based on medical necessity – the Insureds identified in Exhibits "1" through "3" who were treated at the same Clinic routinely received multiple items of Fraudulent Equipment of virtually the same type.

87.     In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment from a healthcare provider, the patient's subjective complaints are evaluated, and the

treating provider will direct a specific course of treatment based upon the patient's individual symptoms or presentation.

88. Furthermore, in a legitimate setting, during the course of a patient's treatment, a healthcare provider may – but not always – prescribe DME that should aid in the treatment of the patient's symptoms. The specific DME that would be prescribed to aid the treatment of the patient would always directly relate to the patients' individual symptoms or presentation.

89. In determining whether to prescribe DME to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME. In all circumstances, any prescribed DME would always directly relate to each patient's individual symptoms or presentation.

90. If a healthcare provider determines that DME is medically necessary after taking into account a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would indicate in a contemporaneous medical record, such as an evaluation report, what specific DME was prescribed and why.

91. There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident.

92. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in an automobile accident.

93. Nevertheless, the Referring Providers routinely issued prescriptions for the same or substantially similar DME over and over to the Insureds they treated at the Clinics.

94.     It is improbable that Insureds involved in different automobile accidents, but who were treated at the same specific No-Fault Clinic, would warrant prescriptions for DME of substantially the same type.

95.     It is extremely improbable – to the point of impossibility – that a substantial number of Insureds who were involved in the same accident and were purportedly issued Fraudulent Equipment from the Provider Defendants, would require numerous identical items of DME.

96.     In keeping with the fact that the DME dispensed by the Provider Defendants were not medically necessary and were prescribed and dispensed pursuant to predetermined protocols to maximize profits, the Provider Defendants routinely received prescriptions for substantially identical – if not exactly identical – DME issued to Insureds involved in the same accident.

97.     For example:

    i.    On September 13, 2024, three Insureds – KB, MD, and MP – were involved in the same automobile accident. Thereafter, KB, MD and MP all presented to the Clinic located at 5506 Avenue N, Brooklyn for treatment. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a "Wearable PEMF Device" billed to GEICO under HCPCS Code E0747, pursuant to virtually identical prescriptions. KB, MD and MP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by J Flexible.

    ii.    On August 14, 2024, three Insureds – JP, MG, and JV – were involved in the same automobile accident. Thereafter, JP, MG and JV all presented to the Clinic located at 719 Southern Boulevard, Bronx for treatment. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a "Wearable PEMF Device" billed to GEICO under HCPCS Code E0747, pursuant to virtually identical prescriptions. JP, MG and JV were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by J Flexible.

23

iii.   On October 31, 2024, two Insureds – DA and ES – were involved in the same automobile accident. Thereafter, DA and ES all presented to the Clinic located at 6 Gramatan Avenue, Mount Vernon for treatment. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a "Wearable PEMF Device" billed to GEICO under HCPCS Code E0747, pursuant to virtually identical prescriptions. DA, and ES were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by LJR.

iv.   On October 1, 2024, three Insureds – JH, RH, and JM – were involved in the same automobile accident. Thereafter, JH, RH and JM all presented to the Clinic located at 719 Southern Boulevard, Bronx for treatment. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a "Wearable PEMF Device" billed to GEICO under HCPCS Code E0747, pursuant to virtually identical prescriptions. JH, RH and JM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by LJR.

v.   On October 17, 2024, four Insureds – FC, JM, AP, and ST – were involved in the same automobile accident. Thereafter, FC, JM, AP, and ST all presented to the Clinic located at 719 Southern Boulevard, Bronx for treatment. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a "Wearable PEMF Device" billed to GEICO under HCPCS Code E0747, pursuant to virtually identical prescriptions. FC, JM, AP, and ST were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by LJR.

98.   These are only representative examples.

99.   Moreover, in a legitimate clinical setting, if a healthcare provider determines that DME is medically necessary after considering a patient's individual circumstances and symptoms, the healthcare provider would document in a contemporaneous medical record, such as an

24

evaluation report, what specific DME was prescribed and why it was medically necessary or how it would help treat the Insureds.

100. To the contrary, to the extent there was a contemporaneously dated evaluation report, the Referring Providers virtually always failed to document the medical necessity of the Fraudulent Equipment and oftentimes failed to even identify the Fraudulent Equipment purportedly prescribed.

101. Furthermore, and in keeping with the fact that the prescriptions for the Fraudulent Equipment were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, to the extent that Insureds returned for a follow-up examination, the follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment.

102. In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME or adjust the patient's treatment as necessary.

103. However, the Referring Providers' follow-up examination reports virtually always failed to include any information regarding the Fraudulent Equipment prescribed to the Insureds on a prior date.

104. In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" through "3" were part of predetermined protocols designed to maximize profits, and not based upon medical necessity, the prescriptions were typically not given to

25

Insureds, but as part of the unlawful financial arrangements were routed directly to the DME Defendants by the Clinic Controllers.

105.    For the reasons set forth above, and below, in each of the claims identified in Exhibits "1" through "3", the DME Defendants falsely represented that the Fraudulent Equipment was provided pursuant to prescriptions from healthcare providers for medically necessary DME, and were therefore eligible to collect No-Fault Benefits in the first instance, when, in reality the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to the DME Defendants pursuant to collusive financial arrangements.

**D.    The Fraudulent Billing for PEMF Devices**

106.    As part of the fraudulent scheme, the Provider Defendants routinely submitted charges for "Wearable PEMF Devices" under HCPCS Code E0747.

107.    PEMF Devices are marketed as providing pain relief using Pulsed Electromagnetic Field Therapy. Various commercial insurers have issued policy bulletins that make clear that pulsed electromagnetic stimulation is experimental and investigational.

108.    Notwithstanding the experimental and investigational nature of Pulsed Electromagnetic Field therapy, the Provider Defendants repeatedly purported to dispense expensive PEMF Devices to numerous Insureds solely to maximize profits without regard to genuine patient care.

109.    The Insureds to whom the DME Defendants purported to provide Fraudulent Equipment were generally involved in relatively minor, low-impact "fender-bender" accidents, to the extent they were involved in any accidents at all.  They did not suffer any significant injuries or health problems as a result of the relatively minor accidents they experienced, nor did they

26

exhibit any symptoms that would justify the use of an experimental and investigational PEMF Device.

110.    Here, the Defendants provided the PEMF Devices to Insureds who were purportedly experiencing musculoskeletal pain, including back, shoulder, and/or neck pain.

111.    In a legitimate clinical setting, treatment for neck, back, or shoulder pain should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal anti-inflammatory analgesics, such as ibuprofen or naproxen sodium.

112.    If such conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.  These clinical approaches are well-established.

113.    Moreover, policy bulletins by commercial insurers make clear that pulsed electromagnetic stimulation is experimental and investigational and there is no legitimate body of evidence that establishes the effectiveness of PEMF Devices for the treatment of back, neck, or shoulder pain.

114.    Virtually all the Insureds who received a PEMF Device were already enrolled in a multidisciplinary course of treatment at the Clinics, including physical therapy and chiropractic care.

115.    Moreover, virtually all the Insureds who received a PEMF Device also received large volumes of other DME pursuant to the fraudulent billing and treatment protocols at the Clinics where they were treated, such that there was no justification for the use of an additional experimental and investigational device such as the PEMF Device.

116.    Furthermore, and in keeping with the fact that the prescriptions for the Fraudulent Equipment were not medically necessary and were provided, as discussed above, pursuant to a predetermined fraudulent protocol, in many instances, multiple prescriptions were issued on the same day by the same provider for nearly identical DME, which were filled by a litany of DME providers including the Provider Defendants.

117.    For example:

i.      Insured TJ was involved in a motor vehicle accident on September 6, 2024. On September 12, 2024, PA Nicoloff purportedly issued three separate prescriptions for PEMF Devices and/or Osteogenesis Stimulators to TJ. On September 18, 2024, Defendant J Flexible filled one of the prescriptions by purportedly providing TJ with a PEMF Device and subsequently billed GEICO $3,300.00 under HCPCS Code E0747, which represents an Osteogenesis Stimulator.  On September 23, 2024, another company – DROZ Medical Supply – purportedly provided TJ with another Osteogenesis Stimulator and subsequently billed GEICO $2,700.00 under HCPCS Code E0760. On September 23, 2024, a third company – Pinnacle OS LLC – purportedly provided TJ with another Osteogenesis Stimulator and billed GEICO $3,300.00 under HCPCS Code E0747. Finally, two months later, on November 21, 2024, PA Nicoloff issued a fourth prescription for an Osteogenesis Stimulator, which was purportedly provided to TJ by Parkside Med SPL Corp on December 5, 2024, and billed to GEICO for $3,300.00 under HCPCS Code E0747. In total, GEICO was billed $12,600.00 for PEMF Devices and/or Osteogenesis Stimulators purportedly provided to TJ and prescribed by PA Nicoloff.

ii.     Insured LT was involved in a motor vehicle accident on September 6, 2024. On September 12, 2024, PA Nicoloff purportedly issued three separate prescriptions for PEMF Devices and/or Osteogenesis Stimulators to LT. On September 18, 2024, Defendant J Flexible filled one of the prescriptions by purportedly providing LT with a PEMF Device and subsequently billed GEICO $3,300.00 under HCPCS Code E0747, which represents an Osteogenesis Stimulator. On September 19, 2024, another company – DROZ Medical Supply – purportedly provided LT with another Osteogenesis Stimulator and subsequently billed GEICO $2,700.00 under HCPCS Code E0760. On January 20, 2025, a third company – Platinum Line – purportedly provided LT with another Osteogenesis Stimulator and billed GEICO $2,700.00 under HCPCS Code E0760. Finally, less than one month later, on October 17, 2024, PA Nicoloff issued a fourth prescription for an Osteogenesis

28

Stimulator, which was purportedly provided to LT by Go For Med Supply Corp on October 24, 2024 and billed to GEICO for $3,300.00 under HCPCS Code E0747. In total, GEICO was billed $12,000.00 for PEMF Devices and/or Osteogenesis Stimulators purportedly provided to LT and prescribed by PA Nicoloff.

iii.    Insured HB was involved in a motor vehicle accident on September 6, 2024. On September 12, 2024, PA Nicoloff purportedly issued three separate prescriptions for PEMF Devices and/or Osteogenesis Stimulators to HB. On September 16, 2024, Defendant J Flexible filled one of the prescriptions by purportedly providing HB with a PEMF Device and subsequently billed GEICO $3,300.00 under HCPCS Code E0747, which represents an Osteogenesis Stimulator. On September 23, 2024, another company – Pinnacle OS LLC – purportedly provided HB with another Osteogenesis Stimulator and subsequently billed GEICO $3,300.00 under HCPCS Code E0747. On September 23, 2024, a third company – DROZ Medical Supply – purportedly provided HB another Osteogenesis Stimulator and billed GEICO $2,700.00 under HCPCS Code E0760. Finally, less than a month later, on October 10, 2024, PA Nicoloff issued a fourth prescription for an Osteogenesis Stimulator, which was purportedly provided to HB by Go For Med Supply Corp on October 22, 2024, and billed to GEICO for $3,300.00 under HCPCS Code E0747. In total, GEICO was billed $12,600.00 for PEMF Devices and/or Osteogenesis Stimulators purportedly provided to HB and prescribed by PA Nicoloff.

iv.    Insured SU was involved in a motor vehicle accident on October 10, 2024. On October 17, 2024, Yledede Mimi Cummings NP ("NP Cummings") purportedly issued three separate prescriptions for PEMF Devices and/or Osteogenesis Stimulators to SU. On December 13, 2024, Defendant LJR filled one of the prescriptions by purportedly providing SU with a PEMF Device and subsequently billed GEICO $3,300.00 under HCPCS Code E0747, which represents an Osteogenesis Stimulator. On November 15, 2024, another company – Pinnacle OS LLC – purportedly provided SU with another Osteogenesis Stimulator and subsequently billed GEICO $2,700.00 under HCPCS Code E0760. On November 18, 2024, a third company – Supply Choice NYC Inc – purportedly provided SU a "Photon Advanced PEMF InfraMat PRO®" PEMF Device and billed GEICO $3,000.00 under HCPCS Code E0221. Two months later, on November 14, 2024, NP Cummings issued a fourth prescription for an Osteogenesis Stimulator, which was purportedly provided to SU by Clearcare Medical Supplies Inc on December 20, 2024, and billed to GEICO for $3,300.00 under HCPCS Code E0747. Finally, on January 6, 2025, NP Cummings issued a fifth prescription for an Osteogenesis Stimulator, which was purportedly provided to SU by Careplus

Equipment Inc on January 12, 2025, and billed to GEICO for $2,700.00 under HCPCS Code E0760. In total, GEICO was billed $15,000.00 for PEMF Devices and/or Osteogenesis Stimulators purportedly provided to SU and prescribed by NP Cummings.

v.    Insured QB was involved in a motor vehicle accident on August 27, 2024. On September 19, 2024, Stanislav Leshchinskiy NP ("NP Leshchinskiy") purportedly issued three separate prescriptions for PEMF Devices and/or Osteogenesis Stimulators to QB. On September 19, 2024, Defendant J Flexible filled one of the prescriptions by purportedly providing QB with a PEMF Device and subsequently billed GEICO $3,300.00 under HCPCS Code E0747, which represents an Osteogenesis Stimulator. On September 23, 2024, another company – Pinnacle OS LLC – purportedly provided QB with another Osteogenesis Stimulator and subsequently billed GEICO $3,300.00 under HCPCS Code E0747. On September 23, 2024, a third company – Hollis Healing Pro Inc – purportedly provided QB with an "Advanced PEMF InfraMat PRO® MAT" PEMF Device and billed GEICO $3,022.50 under HCPCS Code E0211.  Two months later, on November 25, 2024, NP Leshchinskiy issued a fourth prescription for an Osteogenesis Stimulator, which was purportedly provided to QB by Clearcare Medical Supplies Inc on December 23, 2024, and billed to GEICO for $3,300.00 under HCPCS Code E0747.  Finally, on December 12, 2024, NP Leshchinskiy issued a fifth prescription for an Osteogenesis Stimulator, which was purportedly provided to QB by Careplus Equipment Inc on December 18, 2024, and billed to GEICO for $2,700.00 under HCPCS Code E0760. In total, GEICO was billed $15,622.50 for PEMF Devices and/or Osteogenesis Stimulators purportedly provided to QB and prescribed by NP Leshchinsky.

118.    These are only representative examples.

119.    The Referring Providers virtually never documented in contemporaneous treatment records why the DME prescribed, including the PEMF Devices, was medically necessary – to the extent the prescriptions were even noted in the first instance.  Nor did they in any of the follow-up examinations reference or discuss the Insureds' previously prescribed DME, including the PEMF Devices.

120.    To the extent the prescriptions for the PEMF Devices contained language regarding the medical necessity of the PEMF Devices, the language was preprinted and boilerplate, that the

prescription was "medically reasonable and necessary." Neither the medical reports nor the prescriptions ever contain a discussion of any of the Insureds' actual individual medical needs and diagnoses.

121. By submitting bills to GEICO seeking No-Fault Benefits for PEMF Devices, the Provider Defendants represented that they provided Insureds with a PEMF Device that was medically necessary, as determined by a healthcare provider licensed to prescribe DME.

122. However, the PEMF Devices were not medically necessary. Rather they were prescribed pursuant to predetermined fraudulent protocols and collusive referral arrangements among the Defendants.

123. In addition to dispensing and billing for medically unnecessary PEMF devices, as part of their fraudulent scheme, the DME Defendants misrepresented that they provided Insureds with Osteogenesis Stimulators, resulting in charges of $3,300.00 per Insured who purportedly received the device, even though at best, the DME Defendants dispensed cheap, portable stimulation devices, to the extent any device was dispensed at all.

124. Specifically, for each Insured who purportedly received a prescription for a PEMF Device, the DME Defendants billed GEICO $3,300.00 using HCPCS Code E0747, which represents that the Insured was provided with an "Osteogenesis stimulator, electrical, non-invasive, other than spinal applications".

125. By misrepresenting that they provided Insureds with an Osteogenesis Stimulator as opposed to the cheap, portable stimulation devices that were actually dispensed, the DME Defendants increased their fraudulent billing by an order of magnitude.

126. Osteogenesis stimulators are devices used to encourage bone growth and accelerate fracture healing. Various commercial insurers have issued policy bulletins that make clear the use

31

of an osteogenesis stimulator is only necessary to heal bone fractures under limited circumstances.

Similarly, the Centers for Medicare & Medicaid Services ("CMS") has published guidance stating

that non-implantable electrical osteogenesis stimulators are covered only for limited indications,

such as nonunion of long bone fractures where 6 or more months have elapsed without healing of

the fracture, failed fusions where at least 9 months have elapsed since surgery, and congenital

pseudarthroses, a rare condition where a false joint forms a bone fracture that fails to heal properly.

See https://www.cms.gov/medicare-coverage-database/view/ncd.aspx?NCDId=65&NCDver=2.

127.    CMS's website also refers to other guidance for electrical osteogenesis stimulators

specifically billed under HCPCS Code E0747, which states as follows:

> A non-spinal electrical osteogenesis stimulator (E0747) is covered only if any of the following criteria are met:
>
> 1.   Nonunion of a long bone fracture (see Appendices section) defined as radiographic evidence that fracture healing has ceased for three or more months prior to starting treatment with the osteogenesis stimulator, or
> 2.   Failed fusion of a joint other than in the spine where a minimum of nine months has elapsed since the last surgery, or
> 3.   Congenital pseudarthrosis.
>
> Nonunion of a long bone fracture must be documented by a minimum of two sets of radiographs obtained prior to starting treatment with the osteogenesis stimulator, separated by a minimum of 90 days, each including multiple views of the fracture site, and with a written interpretation by a treating practitioner stating that there has been no clinically significant evidence of fracture healing between the two sets of radiographs.
>
> A non-spinal electrical osteogenesis stimulator will be denied as not medically necessary if none of the criteria above are met.

See https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=33796.

128.    Notwithstanding the limited accepted uses for osteogenesis stimulators, the

Defendants repeatedly purported to bill for expensive Osteogenesis Stimulators under HCPCS

Code E0747, with total reimbursable charges of $3,300.00 per device, which were purportedly

dispensed to numerous Insureds who suffered no bone fractures – all solely to maximize profits without regard to genuine patient care.

129. In fact, the DME Defendants never actually dispensed genuine Osteogenesis Stimulators. To the extent that any device was dispensed at all, the DME Defendants dispensed cheap, portable stimulation devices, that they acquired pursuant to prescription forms that called for "Wearable PEMF Devices".

130. Nevertheless, the DME Defendants fraudulently billed for the PEMF Devices under HCPCS Code E0747 to fraudulently inflate their charges and maximize profits.

131. In keeping with the fact that the devices purportedly dispensed by the DME Defendants were not genuine Osteogenesis Stimulators that qualified for reimbursement under HCPCS Code E0747, the DME Defendants frequently purported to dispense the devices less than two weeks after the alleged automobile accident.

132. For example:

    i. On August 24, 2024 Insured RB was allegedly involved in a motor vehicle accident. J Flexible purportedly delivered an Osteogenesis Stimulator to RB on September 3, 2024, just 10 days after the accident.

    ii. On September 6, 2024 Insured HB was allegedly involved in a motor vehicle accident. J Flexible purportedly delivered an Osteogenesis Stimulator to HB on September 16, 2024, just 10 days after the accident.

    iii. On October 5, 2024 Insured LF was allegedly involved in a motor vehicle accident. J Flexible purportedly delivered an Osteogenesis Stimulator to LF on October 16, 2024, just 11 days after the accident.

    iv. On October 12, 2024 Insured DE was allegedly involved in a motor vehicle accident. J Flexible purportedly delivered an Osteogenesis Stimulator to DE on October 23, 2024, just 11 days after the accident.

    v. On September 6, 2024 Insured LT was allegedly involved in a motor vehicle accident. J Flexible purportedly delivered an Osteogenesis

Stimulator to LT on September 18, 2024, just 12 days after the accident.

vi.      On October 18, 2024 Insured DV was allegedly involved in a motor vehicle accident. J Flexible purportedly delivered an Osteogenesis Stimulator to DV on October 30, 2024, just 12 days after the accident.

vii.      On October 5, 2024 Insured TL was allegedly involved in a motor vehicle accident. J Flexible purportedly delivered an Osteogenesis Stimulator to TL on October 18, 2024, just 13 days after the accident.

viii.      On October 31, 2024 Insured KD was allegedly involved in a motor vehicle accident. J Flexible purportedly delivered an Osteogenesis Stimulator to KD on November 13, 2024, just 13 days after the accident.

ix.      On January 24, 2025 Insured VD was allegedly involved in a motor vehicle accident. LJR purportedly delivered an Osteogenesis Stimulator to VD on January 31, 2024, just 7 days after the accident.

x.      On January 25, 2025 Insured CG was allegedly involved in a motor vehicle accident. LJR purportedly delivered an Osteogenesis Stimulator to CG on February 1, 2025, just 7 days after the accident.

133. These are only representative examples.

134. To date, the DME Defendants have submitted more than $1.7 million worth of fraudulent billing to GEICO under HCPCS Code E0747.

135. For the reasons set forth above, in each of the claims seeking reimbursement under HCPCS Code E0747 identified in Exhibits "1" through "3", the DME Defendants falsely represented that Fraudulent Equipment was provided to Insureds pursuant to prescriptions from healthcare providers for medically necessary DME and Defendants were, therefore, entitled to collect No-Fault Benefits in the first instance, when, in fact, the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to the DME Defendants to fill pursuant to collusive referral arrangements amongst the Defendants.

34

136.    Moreover, the DME Defendants' misrepresentations regarding the items purportedly dispensed inflated the charges submitted to GEICO and resulted in the DME Defendants obtaining payment from GEICO under the New York "No-Fault" laws to which the DME Defendants were never entitled.

**E.    The Fraudulent Billing for Powered Air Mattresses**

137.    In addition to PEMF Devices/Osteogenesis Stimulators, the DME Defendants routinely submitted, or caused to be submitted, bills to GEICO through LJR seeking reimbursement for purported Powered Air Mattresses.

138.    For each Insured who purportedly received a Powered Air Mattress, LJR billed GEICO $3,961.75 under HCPCS Code E0277, which represents that the Insured was provided with a "Powered pressure-reducing air mattress".

139.    Powered Air Mattresses are specially designed medical beds that use air pressure to help manage and redistribute body weight and are used to treat patients who are bedridden for extended periods of time and who develop, or are at a high risk of developing, pressure ulcers.

140.     Various commercial insurers have issued policy bulletins that make clear the use of a Powered Air Mattress is only necessary under limited circumstances, while CMS's website refers to guidance for Powered Air Mattresses billed under HCPCS Code E0277 that limits coverage to a patient suffering from pressure ulcers. See https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?lcdId=33642&ver=26.

141.    Notwithstanding the limited accepted uses for Powered Air Mattresses, LJR repeatedly billed for expensive Powered Air Mattresses under HCPCS Code E0277, which were purportedly dispensed to numerous Insureds who suffered no pressure ulcers, nor were at risk of developing pressure ulcers – all solely to maximize profits and without regard to genuine patient

35

care.

142.    As with the other Fraudulent Equipment billed by the DME Defendants, the Powered Air Mattresses were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

143.    The Insureds to whom the DME Defendants purported to provide Powered Air Mattresses were generally involved in relatively minor, low-impact "fender-bender" accidents, to the extent they were involved in any accidents at all.  They did not suffer any significant injuries or health problems as a result of the relatively minor accidents they experienced, were not bedridden, and did not exhibit any symptoms that would justify the use of a Powered Air Mattress.

144.    In keeping with the fact that the Powered Air Mattresses were not medically necessary and were prescribed pursuant to predetermined fraudulent protocols, the Referring Providers' examination reports make no mention of pressure ulcers for any Insured.

145.    Instead, the examination reports and prescription forms typically indicated that the Insureds were experiencing some form of musculoskeletal pain.

146.    In further keeping with the fact that the Powered Air Mattresses were not medically necessary and were prescribed pursuant to predetermined fraudulent protocols, virtually every Insured who purportedly received a Powered Air Mattress was also prescribed physical therapy multiple times per week.  It would be virtually impossible for an Insured to be mobile enough to attend physical therapy multiple times per week and also be bedridden to a sufficient degree to develop pressure ulcers.

147.    To-date, LJR has submitted over $915,000.00 in fraudulent billing to GEICO under HCPCS Code E0277.

36

148.    As with the other Fraudulent Equipment billed by the DME Defendants, the Powered Air Mattresses were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

III.    **The Fraudulent Billing the DME Defendants Submitted or Caused to be Submitted to GEICO**

149.    To support their fraudulent charges, the DME Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms, HCFA-1500 forms, and/or treatment reports to GEICO through and in the name of the Provider Defendants, seeking payment for the Fraudulent Equipment.

150.    The NF-3 forms, HCFA-1500 forms, and treatment reports that the DME Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)    The NF-3 forms, HCFA-1500 forms, and supporting documents uniformly misrepresented to GEICO that the DME Defendants provided Fraudulent Equipment pursuant to prescriptions from licensed healthcare providers for reasonable and medically necessary DME, and therefore were entitled to receive No-Fault Benefits.  In fact, the DME Defendants were not entitled to receive No-Fault Benefits because, to the extent that the DME Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the DME Defendants, and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols;

(ii)    The NF-3 forms, HCFA-1500 forms, and supporting documents uniformly misrepresented to GEICO that the DME Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and therefore were entitled to receive No-Fault Benefits.  In fact, the DME Defendants were not entitled to receive No-Fault Benefits because, to the extent that the DME Defendants provided any Fraudulent Equipment, it was based on decisions

made by laypersons, not based upon lawful prescriptions from licensed healthcare providers for medically necessary items; and

(iii)    The NF-3 forms, HCFA-1500 forms, and supporting documents uniformly misrepresented to GEICO that the DME Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form, and therefore were eligible to receive No-Fault Benefits. In fact, the DME Defendants were not entitled to receive No-Fault Benefits because – to the extent that the DME Defendants provided any Fraudulent Equipment to the Insureds – the Fraudulent Equipment did not meet the specific requirements for the HCPCS Codes identified in the NF-3 and/or HCFA-1500 forms.

## IV.    The DME Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

151.    The DME Defendants legally and ethically are obligated to act honestly and with integrity in connection with the provision of DME to Insureds, and their actual submission of charges to GEICO.

152.    To induce GEICO to promptly pay the charges for Fraudulent Equipment, the DME Defendants have gone to great lengths to systematically conceal their fraud.

153.    Specifically, the DME Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the Fraudulent Equipment was pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the DME Defendants and others not presently known (i.e. the John Doe Defendants) without regard for genuine patient care.

154.    Additionally, the DME Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the Fraudulent Equipment was pursuant to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive financial arrangements.

155.    Furthermore, the DME Defendants knowingly misrepresented and concealed facts

to prevent GEICO from discovering that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons, without legal authority to issue a prescription, and not by an actual healthcare provider.

156. In addition, the DME Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the DME Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment purportedly provided to the insureds.

157. Finally, the DME Defendants knowingly concealed facts related to their relationship as part of an integrated scheme. Specifically, the DME Defendants submitted over $425,000.00 worth of fraudulent billing to GEICO through J Flexible for DME purportedly dispensed from September 2024 through November 2024. The DME Defendants then ceased billing through J Flexible, and began submitting fraudulent billing through LJR to avoid detection and perpetuate the fraudulent scheme.

158. The billing and supporting documentation submitted by the Provider Defendants, when viewed in isolation, did not reveal its fraudulent nature.

159. GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

160. The DME Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. Those law firms file expensive and time-consuming litigation or arbitration against GEICO and other insurers if the charges are not promptly paid in full. Defendants' collection efforts through the filing and prosecution of numerous separate No-Fault collection proceedings, which may continue for years, is an essential part of their fraudulent

scheme, since they know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area -- all intentionally geared to allowing Defendants to monetize the fraud and further perpetuate the RICO enterprise.

161.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to, and did cause GEICO to rely upon them.  As a result, GEICO incurred damages of more than $455,000.00 based upon the fraudulent charges.

162.    Based upon the DME Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against the DME Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

163.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

164.    There is an actual case in controversy between GEICO and the DME Defendants regarding more than $2 million in fraudulent pending billing that has been submitted to GEICO in the names of LJR and J Flexible.

40

165.    The DME Defendants have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based not upon medical necessity but were submitted as part of an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care.

166.    The DME Defendants have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were pursuant to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements.

167.    The DME Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Equipment purportedly provided by the Provider Defendants to Insureds was a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

168.    The DME Defendants have no right to receive payment for any pending bills submitted to GEICO because they fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds and inflated the charges to GEICO, as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds.

169.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the DME Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of J Flexible and LJR.

41

**SECOND CAUSE OF ACTION**
**Against Ivanova**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

170.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

171.   J Flexible and LJR together constitute an association-in-fact "enterprise" (the "DME Provider Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

172.   The members of the DME Provider Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, J Flexible and LJR are ostensibly independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.

173.   The DME Provider Enterprise operated under two separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the DME Provider Enterprise acting singly or without the aid of each other.

174.   The DME Provider Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many individuals who have been responsible for facilitating and performing a wide variety of administrative and ostensibly professional functions beyond the acts of mail fraud and

wire fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by selecting and purchasing the targeted Fraudulent Equipment from wholesalers, by coordinating the fraudulent scheme with various Clinic Controllers and/or Referring Providers operating at multiple No-Fault Clinics, by delivering the Fraudulent Equipment or arranging for its delivery, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

175.    Ivanova has been employed by and/or associated with the DME Provider Enterprise.

176.    Ivanova knowingly has conducted and/or participated, directly or indirectly, in the conduct of the DME Provider Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, and federal wire fraud statute 18 U.S.C. § 1343, based upon the use of the United States mails and interstate wires to submit or cause to be submitted hundreds of fraudulent charges seeking payments that the DME Provider Enterprise was not eligible to receive under the No-Fault Laws, because: (i) the bills submitted to GEICO for the provision of Fraudulent Equipment were not based upon medical necessity but were submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the DME Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) the Fraudulent Equipment was dispensed based on prescriptions secured through

43

collusive arrangements with the John Doe Defendants, and based on decisions by laypersons who are not legally authorized to prescribe DME; and (iii) to the extent that the DME Defendants actually provided Fraudulent Equipment to the Insureds, the bills to GEICO, in virtually every instance, fraudulently mischaracterized the type of DME dispensed and permissible reimbursement amounts for each item and inflated the charges to GEICO. The fraudulent billings and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

177.    The DME Provider Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail and wire fraud are the regular ways in which Ivanova operated the DME Provider Enterprise, inasmuch as the DME Provider Enterprise never operated as legitimate DME retailers, never was eligible to bill for or collect No-Fault Benefits and acts of mail and wire fraud therefore were essential in order for the DME Provider Enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail and wire fraud and the use of multiple TIN numbers and entities implies a threat of continued criminal activity, as does the fact that the DME Defendants continue to attempt collection on the fraudulent billing submitted through the DME Provider Enterprise to the present day.

178.    The DME Provider Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the DME Provider Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

44

179.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $455,000.00 pursuant to the fraudulent bills submitted in furtherance of the DME Provider Enterprise.

180.    By reason of its injury, Plaintiffs are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Ivanova and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

181.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

182.    Ivanova and the John Doe Defendants are employed by and/or associated with the DME Provider Enterprise.

183.    Ivanova and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the DME Provider Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, and federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mails and interstate wires to submit or cause to be submitted fraudulent charges seeking payments that the DME Provider Enterprise was not eligible to receive under the No-Fault Laws because: (i) the bills submitted to GEICO for the provision of Fraudulent Equipment were not based upon medical necessity but were submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the DME Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) the Fraudulent Equipment was

dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants, and based on decisions by laypersons who are not legally authorized to prescribe DME; and (iii) to the extent that the DME Defendants actually provided Fraudulent Equipment to the Insureds, the bills to GEICO, in virtually every instance, fraudulently mischaracterized the type of DME dispensed and permissible reimbursement amounts for each item and inflated the charges to GEICO. The fraudulent billings and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

184.    Ivanova and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

185.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $455,000.00 pursuant to the fraudulent bills submitted in furtherance of the DME Provider Enterprise.

186.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against J Flexible and Ivanova**
**(Common Law Fraud)**

187.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

46

188. J Flexible and Ivanova intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Equipment.

189. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit J Flexible, Ivanova, and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and based on decisions by laypersons who are not legally authorized to prescribe DME; and (iii) in every claim, to the extent that any Fraudulent Equipment was actually provided, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO and was used to inflate the charges to GEICO.

190. J Flexible and Ivanova intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through J Flexible that were not compensable under the No-Fault Laws.

191. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $270,000.00 pursuant to the fraudulent bills submitted

by J Flexible and Ivanova through J Flexible. The chart annexed hereto as Exhibit "2" sets forth a representative sample of the fraudulent claims that have been identified to-date that were submitted to GEICO through J Flexible.

192. The extensive fraudulent conduct by J Flexible and Ivanova demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

193. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against J Flexible and Ivanova**
**(Unjust Enrichment)**

194. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

195. As set forth above, J Flexible and Ivanova engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

196. When GEICO paid the bills and charges submitted by or on behalf of J Flexible for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of J Flexible and Ivanova.

197. J Flexible and Ivanova have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that J Flexible and Ivanova voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

198. J Flexible and Ivanova's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

199.     By reason of the above, J Flexible and Ivanova have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $270,000.00.

## SIXTH CAUSE OF ACTION
### Against the John Doe Defendants
### (Aiding and Abetting Fraud)

200.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

201.     The John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by J Flexible and Ivanova.

202.     The acts of the John Doe Defendants in furtherance of the fraudulent scheme included, among other things, participating in the ownership and control of J Flexible, knowingly routing prescriptions to J Flexible pursuant to the collusive financial arrangements with J Flexible and Ivanova, and knowingly assisting in ensuring that the prescriptions were issued pursuant to a pre-determined protocol to maximize profits without regard to patient care.

203.     The conduct of the John Doe Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of the John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Ivanova and J Flexible to obtain payment from GEICO and other insurers.

204.     The John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Ivanova and J Flexible for medically unnecessary Fraudulent Equipment because they sought to continue profiting through the fraudulent scheme.

205.     The conduct of the John Doe Defendants caused GEICO to pay more than $270,000.00 pursuant to the fraudulent bills submitted through J Flexible.

206.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

207.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief that the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### Against LJR and Ivanova
### (Common Law Fraud)

208.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

209.    LJR and Ivanova intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Equipment.

210.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit LJR, Ivanova, and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and based on decisions by laypersons who are not legally authorized to prescribe DME; and (iii) in every claim, to the extent that any Fraudulent

Equipment was actually provided, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO and was used to inflate the charges to GEICO.

211.    LJR and Ivanova intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through LJR that were not compensable under the No-Fault Laws.

212.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $185,000.00 pursuant to the fraudulent bills submitted by LJR and Ivanova through LJR. The chart annexed hereto as Exhibit "3" sets forth a representative sample of the fraudulent claims that have been identified to-date that were submitted to GEICO through LJR.

213.    The extensive fraudulent conduct by LJR and Ivanova demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

214.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**
**Against LJR and Ivanova**
**(Unjust Enrichment)**

215.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

216.    As set forth above, LJR and Ivanova engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

51

217. When GEICO paid the bills and charges submitted by or on behalf of LJR for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts LJR and Ivanova.

218. LJR and Ivanova have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that LJR and Ivanova voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

219. LJR and Ivanova's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

220. By reason of the above, LJR and Ivanova have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $185,000.00.

## NINTH CAUSE OF ACTION
### Against the John Doe Defendants
### (Aiding and Abetting Fraud)

221. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

222. The John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by LJR and Ivanova.

223. The acts of the John Doe Defendants in furtherance of the fraudulent scheme included, among other things, participating in the ownership and control of LJR, knowingly routing prescriptions to LJR pursuant to the collusive financial arrangements with LJR and Ivanova and knowingly assisting in ensuring that the prescriptions were issued pursuant to a pre-determined protocol to maximize profits without regard to patient care.

224. The conduct of the John Doe Defendants in furtherance of the fraudulent scheme was significant and material. The conduct of the John Doe Defendants was a necessary part of

52

and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Ivanova and LJR to obtain payment from GEICO and other insurers.

225. The John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Ivanova and LJR for medically unnecessary Fraudulent Equipment because they sought to continue profiting through the fraudulent scheme.

226. The conduct of the John Doe Defendants caused GEICO to pay more than $185,000.00 pursuant to the fraudulent bills submitted through LJR.

227. This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

228. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief that the Court deems just and proper.

## JURY DEMAND

229. Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A. On the First Cause of Action against Ivanova, J Flexible and LJR, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Ivanova, J Flexible, and LJR have no right to receive payment for any pending bills submitted to GEICO through J Flexible and LJR;

B.      On the Second Cause of action against Ivanova, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $455,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Ivanova and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $455,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against J Flexible and Ivanova, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $270,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against J Flexible and Ivanova, more than $270,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against John Doe Defendants "1"-"10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $270,000.00, together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

G.      On the Seventh Cause of Action against LJR and Ivanova, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $185,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against LJR and Ivanova, more than $185,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

I.      On the Ninth Cause of Action against the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $185,000.00, together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper.

Dated:  December 4, 2025
Uniondale, New York

RIVKIN RADLER LLP


By: _____/s/ Michael Sirignano_____
Michael A. Sirignano
Barry I. Levy
Sean Gorton
Thomas Paddock

926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

55